# CHARLESTON.

CARNEY *et al. v.* HARBERT *et al.*

Submitted September 7, 1897—Decided November 20, 1897.

CONTRACTS—*Rescission of Contract—Fraud.*

    Where a person enters into a contract for the purchase of a known body of coal, supposed to contain three hundred acres, but the same has been diminished to less than two hundred acres by valid conveyances of the more desirable portion thereof, made by the grantor owner to his children, without the knowledge of the purchaser, and which knowledge is withheld from him by the owner until after a deed is executed, such purchaser will not be compelled to complete such contract, but the same at his instance, will be rescinded. (p. 35).

.Appeal from Circuit Court, Harrison County.

    Bill by C. B. Carney & Co. against B. W. Harbert and·

others.    From a decree in favor of defendants, plaintiffs appeal.

*Reversed.*

John Bassel and John J. Davis, for appellants.

Charles W. Lynch, for appellees.

Dent, Judge:

C. B. Carney *ct al.* appeal from a decree of the Circuit Court of Harrison county entered in a cause therein pending wherein appellants were plaintiffs and Benjamin W. Harbert *et al.* were defendants.    The error assigned is that the Circuit Court refused either to enforce specific performance of the contract, as claimed by the plaintiffs, or rescind the same.    The facts are as follows:    On the 12th day of February, 1890, C. B. Carney & Co. obtained a coal option from Benjamin W. Harbert upon about three hundred and fifty-five acres of land, less fifty acres, reserved, lying on the waters of Robinson's run, in Harrison county, at the price of twenty dollars per acre, to run until the 12th of February, 1892.    Before the option expired, Carney & Co. claim that Harbert agreed to reduce the price to fifteen dollars per acre.    This is denied by Harbert, who claims that he agreed to reduce to seventeen dollars per acre if sale was at once made.    This was not done. On the day the option was to expire, four hundred and seventy-five dollars was paid to Harbert by Carney & Co. on the contract, under the belief that the price had been reduced to fifteen dollars per acre, but Harbert claims "as nominated in the bond," and refused to complete the contract at the reduced price, or return the payment.    The matter remained in this condition until December 30, 1892. In the meantime the membership of Carney & Co. had changed by the substitution of new members for the old, with the exception of C. B. Carney.    At this time, to wit, the 30th day of December, 1892, Carney & Co. sent Messrs. Randall and Meredith to Harbert for the purpose of renewing the option on the same land, and they obtained the following option:

"December 30th, 1892.    In consideration of four hundred and seventy-five dollars, paid on the 12th day of February,

1892, for which receipt was given, which has been paid, the receipt of which is hereby acknowledged, which is to be a credit on the first payment, I have this day sold the 9 (nine) foot or Pittsburg vein of coal underlying my land, supposed to contain three hundred acres, more or less, to C. B. Carney & Co., at the price of seventeen dollars per acre, the balance of the one-third payment to be paid as soon as sufficient deed is made and delivered and notes executed for the deferred payments, said notes to bear interest at the rate of six per cent. from date of delivery of deed until date of maturity of said deferred payments, which is to be paid in two annual payments from the date of first payment.    Said second parties is to have the usual mining privilege.

his
"B. W.  x  Harbert.
mark
"Witness:  G. F. Randall.  ·
"This is a fair bargain and sale.

"G. F. Randall.
"F. M. Meredith.
"G. W. Thompson."

About February, 1893, Harbert executed and delivered to Carney, for Carney & Co., a deed for one hundred and eighty-seven acres of coal, claiming that this, with the reservation of about twenty-eight acres, was all the coal under his lands.   During the existence of the old option he had conveyed away about ninety-five acres of the coal to his children and son-in-law.   Of this Carney & Co. had no knowledge.   Harbert claims that he informed their agents, Randall and Meredith, at the time of signing the last option, that he had only about two hundred and thirty-five acres of land.   But they both deny the same, and claim to have had no information of the transfers to the children. Harbert refusing to make good the deficiency in the amount of the coal by inducing his children to convey the same to Carney & Co., they instituted this suit to compel a conveyance and for general relief.   Answers were filed, and depositions taken, and on the hearing the court refused plaintiffs any relief, but entered a decree against them in favor of Harbert for the unpaid purchase money, and directed a sale of the coal.

The testimony of numerous witnesses was taken, and much thereof is contradictory. But it is very evident that Carney & Co. believed at the time of the second option they were getting the identical coal included in the first, and they knew nothing personally of the arrangements or deeds existing between their grantor and his children, although such deeds had been placed on record. There is evidence tending to show that the coal reserved and included in the conveyances to the children was the best, and located in such manner as to isolate and surround that conveyed to plaintiffs, cut it off from the public road, and separate it from their other purchases. And there is evidence showing that Harbert was withholding from the plaintiffs the knowledge of his conveyance to his children purposely for the purpose of deceiving them He permitted the second option to be written up for three hundred acres, more or less, at a time when he knew he had less than two hundred acres to convey. And when he presented the deed to Carney, and he called his attention to the deficiency, instead of telling him the true cause thereof, intimated that on a survey the coal had fallen short. The deficiency alone was sufficient to have justified the rescission of the contract, as it exceeded one hundred acres in amount, if the quantity was an essential part of the contract. *Pratt* v. *Bowman*, 37 W. Va. 745, (17 S. E. 210;) *Morrison* v. *Waggy*, 43 W. Va., 405, (27 S. E. 314.) In cases of gross deficiency presumptive fraud is usually held to exist, where quantity is an essential part of the contract. *Crislip* v. *Cain*, 19 W. Va., 441. In the latter case (point 6, syllabus) it is held: "Fraud is usually shown by either establishing a *suggestio falsi*, or a *suppressio veri*. A *suggestio falsi*, or misrepresentation, in order to amount to fraud, must not be about a trifling or immaterial thing, but must be material, and not vague or inconclusive in its nature, and must not be a mere matter of opinion, or about a fact equally open to the inquiry of either party, and in regard to which either would presume to trust the other; and when the misrepresentation is material, and not vague, in order to amount to a fraud, it must have been actually relied upon by the other party, who must have been misled by it to his injury to do or agree to do that which he

would not otherwise have done or agreed to do." The insertion of "three hundred acres" in the contract at the time that defendant Harbert knew it to be false, and at a time when he must have known that this would continue in plaintiffs' minds the belief that the new option was but a renewal of the old, and thus deceive them into making a contract foreign to their intentions, fully comes under the definition of fraud as contained in the foregoing syllabus. It is true that defendant Harbert claims that he informed the agents of C. B. Carney & Co. of his transfers to his children at the time of the second option. But both the agents deny it, and there is no evidence that they had any authority from their principals to accept a less quantity of land than was contained in and covered by the first option, and there is no evidence that C. B. Carney & Co. ever had any knowledge of the conveyances to the children, or that they intended to, or ever did, accept a less quantity of coal than was contained in the first option. It cannot, therefore, be either equitable or just to compel them to accept and pay for one hundred and eighty seven acres of coal when they plainly bargained for and expected to receive three hundred acres under a certain boundary of land. The children grantees of B. W. Harbert having received their deeds, and placed them on record, previous to the execution of the second option and not being party to the false suggestions and suppression of the truth on the part of their father, cannot be compelled to convey the coal held by them to the plaintiffs, and therefore there is but one thing a court of equity can do, and that is, rescind the contract, and place the parties, as far as possible, in *statu quo.* If the plaintiffs had been purchasing the coal by the acre, without regard to the quantity or situation, they could not complain of the defendant's actions in withholding from them the transfers to his children. But they were induced to believe, by the conduct of the defendant B. W. Harbert, that they were buying a certain body of coal under a certain tract of land, whereas the same had been greatly decreased in quantity, quality, and situation by acts on the part of their grantor which were not made known by him to his grantees, although it is plainly shown that they were being mislead thereby to their injury.

There is also evidence tending to show that the defendant B. W. Harbert had some kind of arrangement with his children and son-in-law by which, in case it was required of him, he could make good his contract with C. B. Carney & Co. according to their understanding of it. If such be the case, and he can thus satisfactorily comply with his contract, he should be permitted to do so. For these reasons the decree complained of is reversed, and this cause is remanded to the circuit court, with direction to allow the defendant B. W Harbert to comply with his contract by conveying to the plaintiffs the whole boundary of coal as covered by the first option, to wit, of the 12th day of February, 1890, at the price of seventeen dollars per acre or if he is unable or unwilling to do so, to rescind the contract of the 30th day of December, 1892, and place the parties thereto as near as may be in *stalu quo.*

*Reversed.*